Prem KUMAR, Plaintiff, Appellee,

v.

BOARD OF TRUSTEES, UNIVERSITY OF MASSACHUSETTS, Defendant, Appellant.

Prem KUMAR, Plaintiff, Appellant,

v.

BOARD OF TRUSTEES, UNIVERSITY OF MASSACHUSETTS, Defendant, Appellee.

Nos. 84–1469, 84–1470.

United States Court of Appeals, First Circuit.

Argued Nov. 5, 1984.

Decided Sept. 30, 1985.

Lawrence T. Bench, First Associate Counsel, University of Massachusetts, Boston, Mass., for Bd. of Trustees, University of Massachusetts.

Richard M. Howland, Amherst, Mass., with whom Patricia S. Martin and Howland & Sheppard, P.C., Amherst, Mass., were on brief for Prem Kumar.

Before CAMPBELL, Chief Judge, COFFIN, Circuit Judge, and WYZANSKI,* Senior District Judge.

WYZANSKI, Senior District Judge.

This is primarily an appeal by the Board of Trustees of the University of Massachusetts ("the University") from a judgment based on the district court's finding that the University, in denying professorial tenure to Prem Kumar, discriminated against him because of his race and national origin and on that court's conclusion that in so discriminating the university violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* *Kumar v. Board of Trustees of University of Massachusetts,* 566 F.Supp. 1299 (D.Mass.1983).

We need not fully recite the terms of the relief awarded by the court nor repeat either all of the University's objections thereto or the plaintiff's objection which has led to his cross-appeal, for, in our opinion, there is, as a matter of law, no evidence to support the court's finding of discrimination.

The following summary of our opinion seeks to point a path through a complicated record.

* Of the District of Massachusetts, sitting by designation.

The University's denial of tenure for the plaintiff is embodied exclusively in the May 14, 1976 negative decision of the chancellor.

There is no evidence that the chancellor had made with respect to the plaintiff or any other person at any time any statement indicating racial bias, a term we use in this opinion to embrace bias on account of national origin as well as bias on account of race. Nor is there any evidence that the chancellor ever has been accused of racial bias in any case other than this plaintiff's. Nor is there any evidence that racist statements about Kumar were known to the chancellor before he decided not to recommend tenure for Kumar. Nor were such statements referred to in any part of Kumar's file as reviewed by the chancellor in 1976.

The district court's ultimate finding of racial discrimination is based on what seem to us illogical and unsound inferences.

We now turn from the summary of our opinion to a more elaborate recital of the facts. Except when we note otherwise, we rely upon the findings of the district court.

On February 23, 1970 the University appointed for one year Prem Kumar, who had been born in 1943 in Rawalpindi, India—now Pakistan—to the non-tenured position of Assistant Professor of General Business and Finance in the School of Business Administration of the University of Massachusetts at Amherst.

In 1975–76 Kumar came up for a tenure decision. The University's regulations governing tenure were set forth in a brochure entitled "Academic Personnel Policy", of which there were editions in 1975 and 1976, not different in any respect material to this case. The texts are set forth in the district court's opinion. One relevant section provides that "Consideration of a candidate for tenure shall be based on ... [c]onvincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research, creative or professional activity; and of service ..." The regulations provide that evaluation of the candidate is made successively by the candidate's own department, the department chairman, the faculty personnel committee of the school, the dean of the school, the provost of the campus, and the chancellor of the campus. In those successive reviews each reviewing authority has before it a file with respect to the candidate. That file should (1) contain the annual evaluations made of the candidate which summarize student opinion as well as faculty opinion of the candidate's teaching ability, (2) set forth what scholarly work the candidate has published and is engaged in, (3) report on his service activities, and on his publications, (4) include the letters commenting on the candidate and (5) transmit the judgments expressed by those who have already reviewed the file. In general, each review is an appellate, not a *de novo* proceeding. Emphatically this is so at the "campus level" of review—the only one we need consider in depth. The following provisions, of which paragraph 3 deserves special note, govern:

At the campus level, there shall be a review of the college or school recommendation that is based on all the evidence in the basic personnel file. The following considerations shall apply to the campus review, recommendation, and, where appropriate, decision:

1) Prior to a recommendation or decision that may be contrary to the recommendation from the next lower level, the Provost and Chancellor shall invite the officer at that level to provide additional information for the basic file or clarification of the recommendation.

2) Review of the recommendation shall take into consideration the qualifications of the individual, and, for ... the award of tenure, the justification of the recommendation within the context of campus long-range plans.

3) When the Provost and Chancellor make a recommendation or decision contrary to the recommendation from the next lower level, it shall be only for compelling reasons, written in detail, which shall specifically address

the content of the recommendations and the established criteria.

When Kumar's file reached the campus level and was delivered to Associate Provost Bischoff, it contained a 5–2 favorable vote by the plaintiff's department, a favorable recommendation by the departmental chairman, Sidney Sufrin, a 6–0 favorable recommendation by the School of Business Administration Personnel Committee, a favorable recommendation by that school's dean, George S. Odiorne, the six salmon-colored annual reviews of Kumar's performance from October 1, 1970 through August 31, 1975, copies of the three full-length scholarly articles and various shorter reviews published by the plaintiff, letters by Associate Dean Wolf, and a recommending letter from the chairman of the Department of Economics at Princeton University—a former colleague of the plaintiff and an attendant at some of his lectures.

In Dean Odiorne's December 17, 1975 memorandum of recommendation there are included these paragraphs:

> There is a note of concern about his teaching, which was communicated to the Dean and Associate Dean, as noted in Dr. Wolf's letter. Kumar is foreign born, and his modes of communication are not that of the native born American. He is perfectly lucid in his language, but combined with one of the most technical and difficult courses tends to produce lower ratings among non-majors in core courses. He is concerned about it and works at improving this dimension. The content of his courses is impeccable, his rigour [sic] unmatched, and the best students praise him highly. In technical sessions for his peers he is articulate and they have no problem.
>
> When the chairman of the economic [sic] department at Princeton states a firm recommendation and indication from other persons of equal competence and prestige suggests that he would merit tenure at any institution, I would suggest that it would be a serious error to let him get away from us. The peronnsel [sic] committee deliberated upon his teaching and

concluded that rigor and competance [sic], specially [sic] at the advanced level would merit a unanimous recommendation. The possibilities that he may gravitate toward graduate courses where he is more successful and less in the basic introductory courses where the non-majors and less quant [sic] competent students find him less pleasing is a possible solution. I concur with his chairman, his personnel committee, the school's personnel committee, and recommend approval of tenure and promotion.

With that background, Associate Provost Bischoff, in an April 9, 1976 memorandum, informed Dean Odiorne that the Kumar file "exhibits strength, possibly excellence, in research/scholarship, but I cannot find convincing evidence for strength in either teaching or service." [Ex. 88]. Bischoff requested Odiorne's reaction to Bischoff's "firm belief that Professor Kumar's teaching has been and still is well below average for the department and the School. Unless this perception can be altered, I will have to recommend that he be denied tenure."

On April 23, 1976 Dean Odiorne replied with a memorandum, well over a thousand words long, which concluded that he, the departmental faculty, and the school personnel committee all recommended that Kumar be given tenure. However, the text is filled with negative data including the following passage which the district court's findings omit. (See 566 F.Supp. at p. 1310):

> In addition to the departmental committee, the Dean's Office has studied Kumar's case further and the following information [was] generated.
>
> 1.  Dean Wolf at my request with students of the Graduate Business Association, in conference on levels of teaching in the School found discontent among them about Master's level course teaching. Wolf suggested a written evaluation instrument for all MBA students, unlike the regular questionnaire asking MBA's rated the five highest and five lowest teachers. Kumar appeared among the lowest more than a dozen times,

and was listed among the top five only once. (See the Wolf report attached)

2. The reasons for this rating are given, and personal interviews with members of the Student Cabinet and MBA association indicated that he is seen by these students as *excessively theoretical,* difficult to follow, and requires more math and quantitative assignments than any other course. He does not deal with current events. [Emphasis in original]

3. In a recent attempt to respond to peer and student advice, Kumar followed a suggestion of students that he start each class dealing with current events from financial papers such as the Wall Street Journal and New York Times. He reluctantly attempted to do this and the result was even more vehement denunciation. A group of MBA candidates visited the Dean demanding his firing. The Dean concludes from this that Kumar is not a good teacher from popular current events. The students are not being unduly deprived, however for Louis Ruyhaper [sic] on ETV is available on Channel 2.

"The Wolf report" (just referred to at the end of paragraph 1, *supra,*) was not fully described in the district court's findings. It was not a report from Wolf himself, but was an April 23, 1976 memorandum from Odiorne to Bischoff on the subject called "Report of Associate Dean Wolf Into Reported Master's Student Dissatisfaction With Professor Kumar's Teaching". [Ex.23]. That memorandum does *not,* as the district court's findings wrongly imply, contain any racist remarks. That a teacher has difficulty in communicating because of a foreign accent is, if true, a relevant fact, not necessarily a racist slur. That memorandum included Odiorne's version of what Wolf told him that an undetermined number of Kumar's students in an advanced course had written on their questionnaires. This *double hearsay* included the following:

Seventeen specific comments were taken from the questionnaires returned to date, that make mention of the BA 606 course. They are: too theoretical, fire Kumar, can't communicate, Kumar terrible, Kumar teaches quantitative methods of valuing stock which is questionable God-awful, etc.

The district court failed to observe that there is no evidence that any of the particular students whose votes and statements Wolf passed on to Odiorne had ever disclosed a racially biased attitude.

There were in the file as it reached Assistant Provost Bischoff and university officials before May 14, 1976 no racist remarks such as "the little gook" and "that black bastard", on which the plaintiff largely pitched his case.

In sum, the district court's specific findings with respect to the Wolf report fail to recognize that that report has no racial aspect and furnishes no basis for a finding of racial discrimination.

On April 27, 1976 Acting Provost Bischoff by memorandum informed Dean Odiorne as follows:

Thank you for your memorandum of April 23 in response to my memorandum dated April 9 asking for additional clarification in the Kumar case.

As you well know, Section 4.10(a) of the Academic Personnel Policy indicates that tenure consideration will be based on: "Convincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research, creative or professional activity; and of service, such as to demonstrate the possession of qualities appropriate to a member of the faculty occupying a permanent position."

While I may be willing to grant that Dr. Kumar has achieved excellence in research, I am not convinced from data available to me (i.e., the Wolf report, etc.) that Dr. Kumar is even an average teacher in spite of what you cite as peer judgment about the content of his courses. This along with your assessment that his service is adequate places

Dr. Kumar well below the standards envisaged by the University. My assessment of Dr. Kumar's service is that it has been far less than should be expected of a faculty member within the Professional Schools.

In that Dr. Kumar clearly does not meet the stated criteria for tenure, I must inform you that I am recommending that he not be reappointed beyond 8/31/77.

Bischoff's adverse recommendation led to *post-May 14, 1976* protests promoting reconsideration at the provost level. The precise steps are retraced in the district court's opinion. 566 F.Supp. at pp. 1311–14. For our purposes it suffices to note that Bischoff in a *February 2, 1977* memorandum addressed to Provost Paul Puryear reversed his vote and concluded:

At this point, in the face of the support of the School of Business Administration for Dr. Kumar *at all levels*, coupled with the persuasive responses provided to all of my questions and concerns, I feel that I have no other choice than to recommend that Dr. Kumar be granted tenure and am forwarding his file to you for your review and consideration. [Emphasis in the original]

On *May 13, 1977* Provost Puryear reversed the February 2, 1977 favorable recommendation by Bischoff. The district court summarized that reversal as follows:

By memorandum dated May 11[sic], 1977, Plaintiff's Ex. 42, addressed to Bischoff with copies to Chancellor Bromery, Associate Provost Chappell, Dean Odiorne, and Professor Kumar, Provost Puryear indicated that he had conducted his review pursuant to Bischoff's February 2, 1977 memorandum, and expressed his conclusion, based on his thorough study of the original tenure file and the material added since that time, that the original decision of April 1976 was correct and there was no basis for reversing the recommendation to deny tenure. Puryear stated that "[i]t is clear that teaching is the crucial factor in the judgment that Kumar ought not to be awarded tenure," and while noting that the file

contained "a great deal of evidence intended to establish strength . . . which no doubt points in that direction," nonetheless observed that:

[T]here is also a significant amount of contrary evidence. Indeed, I have rarely seen a tenure file with negative assessments of teaching approaching the volume, variety, and credibility that one finds in Kumar's case; and the negative evidence, in my judgment, clearly outweighs the positive. It is not of course, a matter of proportion of positive to negative comments. One has to judge in the appropriate context, and to compare this file with the general run of tenure files as a whole. In this light, the negative material on Kumar's teaching becomes decisive.

Puryear closed the memorandum by indicating that since there was no basis for reversing Bischoff's original recommendation, the "current situation" remained unaltered, and Kumar's termination date remained August 31, 1977.

Meanwhile, on May 14, 1976 Chancellor Bromery, and Acting Provost Alfange had sent to Dean Odiorne the following memorandum [Ex. 29]:

After reviewing carefully the materials in the tenure file relating to Professor Prem Kumar of the Department of General Business and Finance, including the additional material presented at the meeting which we held with you and Professors Sufrin, Burak, and Rivers on May 11, it is our decision to support the recommendation of Associate Provost Bischoff that Professor Kumar not be granted tenure. Therefore, he should now be given a one-year terminal appointment for 1976–77 if he does not already hold an appointment through that academic year, and the necessary Personnel Action forms to provide for the expiration of his appointment, effective August 31, 1977, should also be promptly processed.

Our decision in this case (which, at Professor Kumar's request, was made without considering the report on his teach-

ing prepared by Associate Dean Wolf and submitted to the Provost's Office with your memorandum of April 23, 1976) is based on our conclusion that Professor Kumar has failed to achieve excellence, within the meaning of the Academic Personnel Policy, in any of the three areas of evaluation—teaching, research, or service.

With regard to teaching, while we have taken note of the fact that the evaluations of Professor Kumar's classes have improved dramatically in the past year, and that there is now a modest amount of vigorous student support for the award to him of tenure, the fact remains that all the available evidence of his teaching prior to this year indicates that its quality has been well below average. On the basis of this, and even allowing for the sharp improvement in quality in the past year, it is impossible for us to conclude that Professor Kumar can in any way be described as having achieved excellence in teaching.

With regard to research, we note the brevity of his list of scholarly publications. In six years, he appears to have only three full-fledged articles (as opposed to research notes or book reviews) in refereed journals. While the journals in which this work has appeared are unquestionably of top quality, the limited amount of actual publication makes it impossible to characterize his scholarly achievement as excellent, particularly in light of the serious deficiencies that have been noted in his teaching record.

With regard to service, Professor Kumar has engaged in a modest amount of such activity within the School of Business Administration and off-campus. However, his involvement in service seems to have been at about the level we would routinely expect of all faculty members, and there is no evidence that it can be said to have risen to the level of excellence in any respect.

Since we conclude that Professor Kumar has achieved excellence in none of the three areas of evaluation, and since Section 4.10(a) of the Academic Personnel

Policy requires that there be "[c]onvincing evidence of excellence in at least two" of these areas, we are unable to recommend him to the President for the award of tenure.

Following the chancellor's May 14, 1976 decision, Kumar on June 17, 1977 initiated a grievance procedure. We need not follow all the details. Suffice it to say that, pursuant to June 7, 1979 directions from the president of the University, the chancellor reconsidered the case.

By letter dated July 31, 1979 [Ex. 48] the chancellor wrote to the president of the University as follows:

Pursuant to your memorandum of June 7, 1979, I have now reviewed the complete tenure file and grievance materials of Professor Prem Kumar according to the conditions set forth in the memorandum dated May 18, 1979, from you to the Trustee Committee on Faculty and Educational Policy:

(a) The file was made complete by restoring the materials on teaching and service found missing on May 14, 1976 and July 11, 1977, before I made my review.

(b) In making my review, I considered Associate Provost Bischoff's February 2, 1977 memorandum as the relevant Provost's level recommendation.

(c) Excluded from consideration during my review were the so-called "Wolf Report" and the letter from Professor Hartzler of February 9, 1977.

My review, made under the conditions described above, leads me to the conclusion that I cannot recommend Dr. Prem Kumar for tenure at this time. The file as amended does not contain "convincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research; creative or professional activities; and of service, such as to demonstrate the possession of qualities appropriate to a member of the faculty occupying a permanent position." Specifically, my assessment leads to the conclusion that there is evidence only of

strength in (a) research and professional activity, (b) possible strength in service, but (c) no strength in teaching.

By letter dated August 17, 1979 the president informed Kumar of the chancellor's decision and stated that "the Chancellor's decision ... exhausts the appeal process." [Ex. 47].

Meanwhile, on May 18, 1977 or shortly afterwards the University awarded tenure in the School of Business Administration to Professor William B. Whiston.

On June 28, 1976 Kumar filed with the Equal Employment Opportunity Commission ("EEOC") a charge that the University in denying him tenure had violated 42 U.S.C. § 2000e–5. On March 7, 1978 the Department of Justice sent to Kumar an undated right-to-sue notice which had been issued by the EEOC.

In light of its subsidiary findings—digested above—the district court promulgated its evaluative findings and conclusions of law. In so doing, it followed the framework which we approved in *Banerjee v. Board of Trustees of Smith College*, 648 F.2d 61 (1st Cir.1981).

The court concluded that the plaintiff had established a *prima facie* case inasmuch as he had proved (1) that as an East Indian the plaintiff was a member of a racial or national origin minority; (2) that the plaintiff was a candidate for tenure and was qualified under the University of Massachusetts standards, practices or customs; (3) that despite his qualifications plaintiff was rejected; and (4) that tenure positions in the School of Business Administration were open at the time that the plaintiff was denied tenure.

The court, continuing to apply the analytical framework approved by us in *Banerjee*, found that "Defendant's articulated reason for the denial of tenure to Kumar is that Kumar failed to satisfy the demanding criteria of the University of excellence in two, and strength in a third of the areas of research, service, and teaching." 566 F.Supp. at p. 1323. However, the court added that "The Court views this articulated reason as essentially directed to the decision-making of Bromery after President Knapp had remanded the case to him for review." *Id.*

Next, the court, still adhering to the *Banerjee* framework, considered whether the articulated reason was a pretext. And it found that "the reason articulated by defendant is pretextual." That ultimate finding the court made (see 566 F.Supp. at pp. 1323–26) on these stated grounds: (1) the chancellor had not given any substantive weight to Bischoff's favorable recommendation dated February 2, 1977, (2) the chancellor's statements regarding Kumar's research and service lacked credibility and undercut the chancellor's credibility on the issue of teaching, (3) the chancellor's disparagement of Kumar's teaching was (a) in conflict with the "peer assessment of Kumar's teaching" and (b) based upon statistical compilations of anonymous student course evaluations undertaken pursuant to University procedures and compiled on University forms, (4) while "the heavy emphasis placed upon plaintiff's teaching in the review of his tenure case [suggests that it] was in and of itself a pretext for denying tenure ... The Court does not find that the emphasis placed on teaching was *necessarily* pretextual," [Emphasis added] (5) "the articulated reason of 'no strength in teaching' is not credible ... The careful assessment made by Kumar's peers, the evaluations of his advanced courses, letters of support from students, and the assessment made by a fellow faculty member who actually observed Kumar's teaching first hand were all strongly supportive and indicated excellence, or at the very least, strength in teaching," (6) "the statistical compilations were relied upon ... as a pretextual means of denying tenure" (7) "the Wolf Report did provide a means for the discriminatory attitudes of some students to pervade the decision-making in plaintiff's case," and (8) the failure of University officials to expunge the document from Kumar's file indicated racial bias against Kumar.

The district court also concluded (pp. 1326–27) that its:

findings with respect to the *prima facie* case and rebuttal of defendant's articulated reasons portend and subsume to a greater or lesser extent the Court's findings concerning violations of the University Policy in the review of Kumar's case ... The Court finds that violations of both the letter and the spirit of the University Policy repeatedly occurred in the consideration of Kumar's case resulting in the exclusion of supportive data from his file and the inclusion in his file of improper materials adverse to his case.

The court then stated at p. 1328:

The Court finds from the evidence presented and the inferences drawn therefrom that the denial of tenure to plaintiff was the result of intentional discrimination against him because of his race and national origin, and concludes that the defendant Board of Trustees of the University of Massachusetts is liable to plaintiff for such discrimination.

Upon those findings and conclusions the court entered a judgment ordering, *inter alia*, the University to accord professorial tenure to Kumar. This appeal and cross-appeal followed.

We face a preliminary procedural point. We must determine which particular denial of tenure the plaintiff was entitled to have reviewed by the district court.

When the complaint in this action was filed on June 5, 1978 it was based on the chancellor's May 14, 1976 denial of tenure. It obviously could not be based on his subsequent July 31, 1979 memorandum. Hence the district court erred in its premise that it was reviewing the July 31, 1979 decision by the chancellor. This error vitiates all its evaluative and ultimate findings and conclusions.

Next we face the problem whether the chancellor's May 14, 1976 decision was a final decision of the University and if so whether it was set aside by the president of the University in either his May 18, 1979 memorandum to the Committee on Faculty and Educational Policy [Ex. B] or his June 7, 1979 direction to the chancellor referred in the chancellor's July 31, 1979 letter [Ex. 48] so that the controversy alleged in the complaint has become moot.

When on May 14, 1976 the chancellor stated that he was "unable to recommend him [Kumar] to the President for the award of tenure." [Ex. 29], that decision was a final decision or order of the University. As the chancellor testified, his "negative tenure decisions weren't normally sent forward to the President's Office" [A. 740]. The May 14, 1976 decision was no exception.

Afterwards, on June 17, 1976 the plaintiff initiated a grievance procedure. It was not technically a "petition for rehearing" nor an "appeal." It was a new case: a "collateral attack" on a "final decision". That collateral attack plus this civil action brought by plaintiff in the district court on June 5, 1978 led the president on May 18, 1979 to recommend [Ex. B] and apparently on June 7, 1979 to direct [Ex. 48] the chancellor to reconsider, but not to vacate, his earlier decision. On July 31, 1979 the chancellor wrote the president that "My review ... leads me to the conclusion that I cannot recommend Dr. Prem Kumar for tenure at this time." [Ex. 48]. That communication marked the failure of the collateral attack. However, that collateral attack had not for one moment suspended, as a petition for rehearing or an appeal would have suspended [see *Zimmern v. United States*, 298 U.S. 167, 56 S.Ct. 706, 80 L.Ed. 1118 (1936)] the original 1976 decision by the chancellor.

It follows that no action or conduct which occurred during or after the collateral proceedings can be the basis of liability in the present action. Of course, post-May 14, 1976 behavior may throw a retrospective light on the chancellor's May 14, 1976 decision, but such post-1976 behavior is not *in itself* conduct to which the complaint in this action is addressed or upon which the district court could properly directly base a finding or conclusion of liability. At all times this suit remains an action limited to charging the University with having violated the Civil Rights Act of 1964

by the chancellor's May 14, 1976 decision refusing professorial tenure to Kumar.

We now turn to consider whether the relevant evidence before the district court sustains its ultimate finding that the University racially discriminated against the plaintiff when on May 14, 1976 it denied him tenure.

We approach this question mindful that pursuant to Fed.R.Civ.P. 52(a) we are not to set aside a finding of fact, even a Title VII case finding involving mixed questions of law and fact, unless it was "clearly erroneous." *Sweeney v. Board of Trustees of Keene State College*, 604 F.2d 106, 109, n. 2 (1st Cir.1979) But, as we said in *Sweeney*, "We shall look carefully, however, to detect infection from legal error, and of course the clearly erroneous standard does not shield findings that are unsupported or arbitrary." *Id.*

The district court proceeded quite properly when it analyzed the evidence within the framework which we approved in *Banerjee v. Board of Trustees of Smith College, supra.* Cf. *White v. Vathally*, 732 F.2d 1037 (1st Cir.1984). See *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981).

The district court correctly found that the plaintiff was a member of a racial or national origin minority, was a candidate for tenure at the School of Business Administration, and had been rejected at a time when tenure positions in that school were open. But the first contested issue is whether Kumar was "qualified under [University of Massachusetts] standards." *Banerjee*, p. 62.

The University of Massachusetts standards for tenure, indubitably are, as the court found:

> The award of tenure can be made only by the President with the concurrence of the Board of Trustees. Consideration of a candidate for tenure shall be based on the following:
>
> a) Convincing evidence of excellence in at least two, and strength in the third, of the areas of teaching; of research, creative or professional activity; and of service, such as to demonstrate the possession of qualities appropriate to a member of the faculty occupying a permanent position.

To be "qualified" by the University's standards the candidate must be "excellent" in at least two of the three fields of teaching, scholarship, and service. The chancellor concluded that in none of those fields, except *possibly* scholarship, did Kumar deserve a rating of "excellent."

In our opinion it was clearly erroneous for the district court to have found that the chancellor was wrong in concluding that both in service and in teaching Kumar was not "excellent". So, even if we assume that Kumar was "excellent" in scholarship he was not "qualified", and it was "clearly erroneous" for the district judge to have found otherwise.

Kumar's service consisted almost exclusively of supervision of the candidates for a master's degree. We may—though we are not clear that we should—assume that in refereeing articles for economics journals Kumar was also rendering the kind of service referred to in the University's regulations. But that is the total service in seven years. Kumar says he was never asked to do more than he did. To that the obvious reply is that it is only of the blind that it may justly be said that "They also serve who only stand and wait." Manifestly, Kumar's service was not "excellent." So he was not "qualified" unless his teaching was "excellent"; and *that the district court deliberately did not find to be the case.*

As to Kumar's teaching there is a barely plausible case for claiming that for students in advanced courses, and for those students in introductory courses who were the brightest or the most interested, Kumar was an excellent teacher. But the unanimous, or virtually unanimous academic view—of administrators, teachers, and students—was that for average students in introductory courses Kumar was either below average or average.

Moreover, when the court found that Kumar's teaching was, if not excellent, at least strong, he was undertaking to estimate Kumar's capacity to teach by how advanced and particularly good students viewed him. That was an impermissible approach. The University of Massachusetts and its chancellor had a right to regard as indispensable a candidate's capacity to teach excellently or at least with strength those who are average students in whatever courses the university reasonably and in good faith assigned to the teacher. Understandably, for introductory courses an administrator may prefer a Williston-type of teacher to a Frankfurter-type of teacher. Such preference, if *bona fide*, may not be used as a basis for an inference of racial bias. Nor may a candidate be heard to complain on the ground that the university ought to assign him to teach exclusively graduate students or other types congenial to him. It is for the administrators of the university, acting in good faith, not for the candidate, nor for the judge, to set the dimensions of the post for which the university offers employment. Here the University of Massachusetts had a post for a teacher of introductory and advanced courses in its School of Business Administration. It was not a position so subtly defined as to eliminate a truly qualified candidate toward whom the appointing official had a racial bias.

With regard to Kumar's scholarship we may assume—since it does not matter if we do so indulge the plaintiff—that the district court correctly found that Kumar's scholarship was excellent. But in so assuming we are not to be understood as disagreeing with the chancellor's May 14, 1976 less favorable estimate of Kumar's then response to the academic canon of "publish or perish". It seems to us that it was erroneous for the district court to have found that the chancellor was not in good faith or, to adopt the district court's Pickwickian vocabulary, "incredible" in articulating his judgment that Kumar's scholarship was *not* "excellent".

We deem it appropriate, in light of what we regard as the district court's clearly erroneous and clearly potentially damaging finding that the chancellor lacked "credibility", to add that it was also "clearly erroneous" for the district court to have found that the chancellor's articulated reason for denying Kumar tenure was pretextual.

Fundamental to the district court's error with respect to its pretextual as with respect to its other findings was the court's confusion as to what was the denial complained of in this action. We repeat that this civil action covers only a denial which occurred before suit was brought.

Unhappily, the district court, instead of keeping this case within the boundaries relevant to an action to set aside a May 14, 1976 decision, treated the matter as though the court were reviewing the actions of the University and its officials at later dates. That error led the district court erroneously to premise its conclusions on such out-of-bounds documents as the February 2, 1977 Bischoff memorandum and the vagaries of Dean Odiorne's post-May 14, 1976 activities.

Other errors were the district court's misconstruction of the Wolf report. There was no basis for treating either the text or the sources of that report as racist.

The court's pejorative comments on the statistics before the chancellor and on the omissions from and mistaken inclusions in the Kumar file might have had relevance to a challenge to the due process of the University's procedure. But in themselves they were wholly irrelevant to a charge of racial discrimination, in the absence of any evidence that those who included improper material, or omitted material which should have been included, had a racist bias.

It seems to us that the district court, despite the contrary signal in *Texas Department of Community Affairs v. Burdine, supra*, at pp. 258–260, 101 S.Ct. at 1096–1097, treated Title VII of the Civil Rights Act of 1964 as though it were an affirmative action statute, and so proceeded on the theory that once a candidate was "qualified" under the standards of the university, it would be pretextual for the uni-

versity's administrator not to appoint him on the ground that he did not measure up to the administrator's vision of the ideal teacher. But this overlooks the difference between the selection of a craftsman and of a professional. A bricklayer who can properly lay a specified number of bricks in a specified period is ordinarily as good as any other bricklayer likely to appear. But in the selection of a professor, judge, lawyer, doctor, or Indian chief, while there may be appropriate minimum standards, the selector has a right to seek distinction beyond the minimum indispensable qualities.

Here the chancellor in good faith was seeking not a merely qualified candidate for the professorship, but a teacher particularly well-suited to teaching undergraduates. This he articulated in his testimony [A. 746–47]:

> The mission of the University is, as stated and articulated by the Board of Trustees has been that the most important role of the University is teaching. The faculty members, I think, have demonstrated their agreement with this primary responsibility of the University by each year doing this in depth, how to improve undergraduate teaching. I have heard it articulated many times in the faculty forum and at the Faculty Center by many faculty members, even though there are individual faculty members within my Department that believe that the research record of the Department makes it recognized nationally. The majority of the members of my faculty believe that the best product we put out that gets the best reputation for the University is not particularly a research project but the students that we send out to the graduate schools and the professional schools throughout the country and throughout the world.
>
> So I would, assessing all, that my judgment is that I believe the vast majority of the faculty in my opinion of the campus at the University of Massachusetts of Amherst is that teaching is a number one priority of those three areas.

The chancellor or other appointing authority has the right—one might say the professional duty—to select in good faith among qualified candidates the ones who in his honest judgment best suit the university's needs. That method of selection is the very badge of excellence in the selector, as we all have been taught by perhaps the greatest of academic selectors, Dr. Charles W. Eliot, once president of Harvard University. Disregarding the type of conventionally-qualified but undistinguished candidate who had been picked by his predecessors, Dr. Eliot, against the judgment of the majority of professionals, chose for the Harvard faculty potentially-gifted professors William James, Henry Adams, C.C. Langdell, Charles Eliot Norton, and others who like those just named were originally without much faculty support but who are now enshrined in the *Dictionary of American Biography.*

While a William James may not be available for appointment by any university, the chancellor, since he was in good faith and not biased on account of race, or other prohibited motives, was entitled to decline to pass on to the president and trustees the name of a particular "qualified" candidate on the sole ground that in the chancellor's opinion the candidate was not as good a teacher as the chancellor expects to discover to teach the particular combination of courses for which a candidate is sought.

*Reversed.*

CAMPBELL, Chief Judge (concurring).

I reach the same result as Judge Wyzanski. However, I do not agree that the district court's review was limited to the Chancellor's May 14, 1976 denial of tenure; accordingly, I find it necessary to evaluate the University's actions up to and through the Chancellor's July 31, 1979 decision. In addition, while I agree with much of Judge Wyzanski's discussion, I see some matters in somewhat different perspective, and therefore comment separately.

As is often true of close tenure decisions, the facts of this case evoke considerable sympathy for the rejected applicant. Be-

cause Dr. Kumar's tenure application was supported by many of his colleagues, arguments can be made, and were made, in favor of granting him tenure.

But the district court's authority to reverse the University's decision was limited to the question of whether or not that decision was infected by discrimination based on race or national origin. Neither the district court nor this court is empowered to sit as a super tenure board. I believe that courts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgements regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement. Absent discrimination, a university must be given a free hand in making such tenure decisions. Where, as here, the university's judgment is supportable and the evidence of discrimination negligible, a federal court should not substitute its judgment for that of the university.

Like Judge Wyzanski, I find much evidence supporting Chancellor Bromery's July 31, 1979 letter to President Knapp denying tenure; certainly a reasonable person could have reached the same conclusion as did the Chancellor on the basis of the evidence properly before the Chancellor. I cannot find sufficient evidence in this record for the district court to have concluded, as it did, that Chancellor Bromery's stated reasons for denying tenure were a pretext for discrimination. Rather, I am constrained to believe that understandable sympathy for Dr. Kumar, and lack of sympathy for the outcome of the tenure proceedings, led the district court to infer discrimination without any sufficient basis for doing so.

It is true, as we recognized in *Sweeney v. Board of Trustees of Keene State College,* 604 F.2d 106, 109 n. 2 (1st Cir.1979), that "smoking gun" evidence is hard to come by in a discrimination case. The district judge must have leeway to react to nuances and draw inferences from his observations of the witnesses. But there also has to be a limit to reliance on pure atmospherics. We require, and are expected to require, evidence of discrimination that "stands up in a court of law." Otherwise, a minority applicant who is denied tenure will not merely be as well off as others; he will receive the advantage of a second tenure determination, this time by a judge or a judge and jury. A court cannot simply speculate that a plaintiff *may* have been denied tenure for reasons of race or nationality, any more than a policeman's hunch can substitute for evidence of "probable cause" to arrest a suspect. Universities have a right to exercise independent judgment in choosing faculty so long as they do not discriminate. Inevitably, some tenure decisions, like the present one, will be very close—may, indeed, split the university community and lead responsible people to very different conclusions on the merits. Courts have no license to resolve such disputes except where there is evidence from which to conclude that an illicit motive was at work. The fact that a court might be sympathetic to a tenure award is not enough from which to find discrimination unless the University's stated reasons are palpably unworthy of credence or there is other evidence pointing to discrimination.

Here, while the case on the merits of whether or not to grant tenure was controversial and perhaps close, there was clearly a supportable judgment. The very slight direct evidence of discriminatory animus in the university community as a whole (notably, the racial slurs overheard from a few students who may have been among those providing the low teaching assessment in the Wolf report) is attenuated and unconnected to those who made the ultimate decision. On such a record, I believe the district court was clearly erroneous in finding that Dr. Kumar was denied tenure for reasons of his race or national origin.

### I. *Scope of Review*

Before proceeding to the merits, I must explain my disagreement with Judge Wyzanski concerning the scope of our review.

I do not agree that only the May 14, 1976 order of the Chancellor should have been reviewed by the district court, or may now be reviewed on appeal.

While Kumar's complaint was filed on June 5, 1978, slightly over a year *before* Chancellor Bromery's "final" decision of July 31, 1979, the trial occurred in January of 1983 and took full account of the 1979 determination. Had plaintiff amended his complaint to seek review of the later University proceedings, the point Judge Wyzanski now makes would have been laid to rest. But lack of an amendment is not fatal. Under Fed.R.Civ.P. 15(b), issues not raised by the pleadings may be tried by express or implied consent of the parties. That is exactly what occurred with respect to the issue of whether the University's conduct from May 14, 1976 through July 31, 1979 was discriminatory. Not only did the parties by their acquiescence implicitly consent to trying this issue, the district court stated in its opinion that it regarded Bromery's 1979 "decision-making" as the pivotal issue for its review. No objection was taken to the court's pronouncement, and neither side has challenged it on appeal.

In these circumstances, the question Judge Wyzanski raises can be brought up *sua sponte* now only if it involves non-waivable, jurisdictional concerns. But a party's failure to file with the E.E.O.C. is not a *jurisdictional* prerequisite to suit in a federal court. *See Zipes v. Trans World Airlines*, 455 U.S. 385, 102 S.Ct. 1127, 71 L.Ed.2d 234 (1982); *Reynolds v. Sheet Metal Workers, Local 102*, 702 F.2d 221, 224 (D.C.Cir.1981). Like the statute of limitations, non-compliance with E.E.O.C. filing requirements is waived if not filed as an affirmative defense. Hence, we need not decide the extent to which incidents occur-

ring after the filing of an E.E.O.C. complaint may be raised, *over objection,* in a court proceeding stemming from the original complaint. *See e.g., Oubichon v. North American Rockwell Corp.,* 482 F.2d 569, 571 (9th Cir.1973); *Weise v. Syracuse University,* 522 F.2d 397, 412 (2nd Cir.1975). *But see Moore v. Sunbeam Corp.,* 459 F.2d 811 (7th Cir.1972), and cases cited in Schlei and Grossman, *Employment Discrimination Law* (1976), p. 995 n. 92. The failure to place the University's post-1976 conduct before the E.E.O.C. was not raised as a defense, was not the subject of any kind of objection below, and is not now an issue that we may consider *sua sponte* on appeal.

Our review of the district court's judgment, therefore, should embrace the same time-frame considered by the district court, namely, up to and including Chancellor Bromery's letter to President Knapp dated July 31, 1979. I agree with the district court that it was Bromery's "decision at that time which ultimately terminated substantive decision-making in Kumar's tenure case." While earlier actions by others also deserve consideration, the paramount question is whether or not Bromery would have recommended tenure had it not been for Kumar's race and national origin.[1]

II. *The Merits of the District Court's Finding of Discrimination*

I agree with the district court that a prima facie case as defined in *Banerjee v. Board of Trustees of Smith College,* 648 F.2d 61 (1st Cir.), *cert. denied,* 454 U.S. 1098, 102 S.Ct. 671, 70 L.Ed.2d 639 (1981) was made out, requiring the defendant University, as it did, to "articulate" its reasons for denying tenure to Dr. Kumar. *See* note 1, *supra.* As the court recognized, however, once the employer gave its reasons, the presumption implied by the prima

---

1. The district court described the University's articulated reasons as that

   "the honestly held doubts of Bischoff (at least initially), Alfange, Puryear, and most importantly, Bromery about plaintiff's achievements in teaching, service and research constitute legitimate, non-discriminatory reasons for the denial of tenure."

Because of what the court viewed as violations of the University's internal procedures and the incompleteness of the tenure file before Bischoff, Alfange and Puryear, the court concluded that Bromery's 1979 review was the pivotal decision-making point.

facie case disappeared. *Texas Department of Community Affairs v. Burdine*, 450 U.S. 248, 253, 101 S.Ct. 1089, 1093, 67 L.Ed.2d 207 (1981). Thereafter, the plaintiff carried the burden of proving that he was denied tenure for a discriminatory reason. The evidence constituting the *Banerjee* prima facie case was of little or no assistance in this regard, *see* 450 U.S. at 255, note 10, 101 S.Ct. at 1095, note 10, since to make out such a case plaintiff had only to show,

> "that his qualifications were at least sufficient to place him in the middle group of tenure candidates as to whom a decision granting tenure and a decision denying tenure could be justified as a reasonable exercise of discretion...."

648 F.2d at 63. Thus it remained for plaintiff to prove that he was qualified in the sense that, absent discrimination, he would likely have received tenure.

Here, in finding the plaintiff had proven actual discrimination, the court relied essentially on two types of evidence. First, it found Chancellor Bromery's stated reasons for denying tenure to be lacking in credibility and therefore "pretextual". Where an employer's "proffered explanation is unworthy of credence," *Burdine*, 450 U.S. at 256, 101 S.Ct. at 1095, it may create an inference of discrimination. *Id.*

Second, the court referred to several specific matters from which it implied discrimination: (1) the granting of tenure to a Professor Whiston, a caucasian, whose qualifications in the court's view were comparable to Kumar's, suggesting unequal treatment of Kumar; (2) the so-called Wolf Report, reflecting a poor teaching evaluation by students, a few of whom may have been the same people overheard by Dean Odiorne making racist remarks concerning Dr. Kumar; (3) various supposed procedural defects in Kumar's tenure review (including the fact that, at some moments, favorable parts of his tenure file had been found by Kumar to be detached and missing).

I shall discuss each of these in turn.

**A.** *Whether Chancellor Bromery's Stated Reasons Were So Weak or Implausible as to Create an Inference of Discrimination*

This is not the first time this court has been faced with the question of determining whether an employer's reason for discharging or promoting someone was affected by a "good" reason (i.e., legal business motive) or a "bad" one. As Judge Aldrich wrote in *NLRB v. Eastern Smelting & Refining Corp.*, 598 F.2d 666, 670–71 (1st Cir.1979),

> "If an employer asserts an obviously weak or implausible good reason, or one manifestly unequally applied, this may support an inference that there was a bad reason [i.e., to discharge an employee]. But where the burden is on the [National Labor Relations] Board, except in such clear cases the mere fact that the Board considers the asserted good reason less than compelling will not suffice.... As we have frequently said, the Board may not set up its own business standards and then condemn the employer for not following them. Unfortunately ... the Board all too often has ... labeled the good reason pretextual, although it was apparent that it was a good reason of substance."

In a similar vein, we had criticized "the incantation of the rubric that the Company's reasons for the discharge were 'pretextual'," condemning an administrative law judge for basing his conclusion on a "selective reading of the record." *Liberty Mutual Insurance Co. v. NLRB*, 592 F.2d 595, 603 (1st Cir.1979). We went on to say,

> "The Board denigrates the Company's business justifications for the discharge.... As we have emphasized in our past decisions, it is neither the Board's function, nor indeed ours, to second-guess business decisions. ' "The Act was not intended to guarantee that business decision be *sound*, only that they not be the product of antiunion motivation...." ' " (citing cases).

I cite these cases, although they involve discharges in a labor setting, because the

analysis is equally cogent here. Here, as there, while an inference of discriminatory animus may properly be drawn from an "obviously weak or implausible good reason, or one manifestly unequally applied", 598 F.2d at 670, a tribunal "may not set up its own business standards and then condemn the employer for not following them." Nor do supportable reasons given by a university for refusing tenure become "pretextual" merely because the court disagrees and so labels them.

Indeed, in a university setting, especially where questions of faculty tenure are involved, a court's duty to refrain from inadvertently setting up its own standard is, if anything, greater than the duty of the labor board not to impose its own business standards on the ordinary business employer:

> "Academic freedom, although not a specifically enumerated constitutional right, long has been viewed as a special concern of the First Amendment."

*Regents of the University of California v. Bakke,* 438 U.S. 265, 312, 98 S.Ct. 2733, 2759, 57 L.Ed.2d 750 (1978). Moreover, tenure decisions are by their nature judgmental and subjective. In close cases reasonable people can differ. It is the choice of the university, however, not of the court, that is called for in a faculty member's contract.

In the present case, I think it is as clear as can be that Chancellor Bromery's evaluation of Kumar did not involve reasoning that may be termed "obviously weak or implausible," nor was there evidence sufficient to show that it was "manifestly unequally applied", 598 F.2d at 670. I think the district court made the error of finding Bromery's reasons "pretextual" simply because it became convinced by plaintiff's evidence that the Chancellor's reasons were "less than compelling". *Id.* But as we pointed out in *Liberty Mutual,* "the Act was not intended to guarantee that business decisions be *sound,* only that they not be the product of [illegal] motivation." 592 F.2d at 603.

Both as to service and teaching, there was ample evidence supportive of Bromery's position. Even assuming the court was satisfied that the better-reasoned position lay elsewhere, and that position favored Kumar, this did not warrant a finding that Bromery's reasons were insincere and hence a "pretext" on Bromery's part. A pretext is "a purpose or motive alleged or an appearance assumed in order to cloak the real intention or state of affairs." *Webster's Third New International Dictionary* (1971). People can have vastly different views with utter sincerity. If a university's decision-making process is to stand up, its decisions cannot be overridden any time a court, after reviewing the evidence, thinks it wrong. Disingenuousness on the part of the second highest-ranking officer of a major university cannot be inferred merely because there are others on the campus with strongly-held different views.

In his letter of July 31, 1979 to the President of the University, Chancellor Bromery concluded that the file as amended (and, expressly, without consideration of the so-called "Wolf Report" and Professor Hartzler's letter) did not contain the requisite convincing evidence of excellence in at least two, and of strength in the third, of the areas considered relevant in tenure decisions. Specifically, Bromery found (a) "evidence of strength" in one area, research, creative and professional activity; (b) "possible strength" in a second area, service, but (c) "no strength" in the third, teaching.

In holding these conclusions pretextual, the court stated that Kumar was "excellent" in research and scholarship (the area in which Bromery conceded at least "strength"), and then went on to substitute its own findings that Kumar's service was "excellent" and his teaching (where Bromery found "no strength") "excellent" or at least strong.

These latter findings, in my opinion, constitute an imposition by the court of its own tenure standards for those of the constituted authorities. It is not a court's

prerogative to pick and choose among the evidence and, on the basis of its own choice, to reject the Chancellor's. The court was limited to determining whether the Chancellor's evaluation of Kumar was so lacking in any kind of support as to give rise to an inference of bad faith. Nothing like that was established.

### 1. *Service*

Looking first at service, I do not see how the court could find that a reasonable university had no choice but to hold that Kumar's service was "excellent". The concept of "service", first of all, is an amorphous one which must be judged comparatively, based on one's experience and sense of what others, similarly situated, have done. A number of educators besides Bromery, including Acting Provost Alfange and Vice Chancellor Puryear, shared in Bromery's modest evaluation of Kumar's service. Kumar's service consisted mainly of administration of certain masters' degree candidates. It also included refereeing articles for scholarly journals, a function which Bromery felt should count mainly as research, not service. Dean Odiorne, Dean of the School of Business Administration and a Kumar supporter, was lukewarm about Kumar's service in his letter of April 23, 1976. He stated that his "service is adequate in the context of his program direction of an important MS degree, but not outstanding." (This should be compared with the Dean's enthusiastic review of the service of another tenure candidate, Whiston, whose varied services on committees, publications, etc., took him a paragraph to list. It should be noted, however, that Kumar's referee work was omitted at this stage.) In the initial application, comments on service from the personnel committee of Kumar's department were limited to statements that Kumar "participates actively in the affairs of the department", and from the personnel committee of the Business School, that "[h]e has carried his proportionate share of service within the University." Professor Sufrin, a member of Kumar's department and former department chairman who vacillated on the issue of tenure, at one point evaluated Kumar's service to his profession and to the school as "moderately low."

There were, to be sure, other far more enthusiastic ratings and some appealing arguments on Kumar's behalf. Dr. Kumar said he was never asked to do more, and there was evidence that the department did not necessarily demand or expect more from young faculty at the time.

The court credited the glowing evaluations of Kumar's service from his supporters, and rejected all others. However, peer judgment is only one aspect of the tenure process at the University. Approval is also required at the Provost and Chancellor levels by administrators who have the benefit of seeing the levels of performance in other departments and schools. The University could believe that departmental colleagues would have a narrower, more parochial view. People like Bromery, who testified to reviewing as many as 100 tenure files a year, appraised Kumar's service as ordinary, and I do not see how this can be swept aside as lacking in credit-worthiness.

I do not mean to say that a different Chancellor might not have rated Kumar's service more highly. There was a good deal of evidence pro and con. Provost Bischoff, who began by regarding Kumar's service as "far less than should be expected," finally recommended tenure, and came to accept refereeing as a form of service. What types of service, and how much, make for "excellence" is unclear; the criterion is obviously subjective and after reading the entire record I feel no more enlightened. But I certainly do not find the record sufficiently of one piece to support the court's implied conclusion that an honest Chancellor could not have concluded, as did Bromery, that Kumar's service was less than excellent.

Judge Wyzanski points out that if Kumar was less than excellent in service, he could not be said to be entitled to tenure. Even assuming excellence in research and professional activity, Kumar must then have lacked excellence in two of the three fields—service and teaching—since even

the district court acknowledged that a finding of something less than excellence would be warranted as to his teaching.

### 2. *Teaching*

Teaching, of course, was the skill in which Kumar was found to be most lacking by Bromery and others. It is also the area where, in my opinion, the district court most clearly set up its own opposing standards and rejected out-of-hand all views to the contrary.

The court conceded that "[a]t first blush" teaching would appear to be a source of concern because of low student evaluations of Kumar on *official* University questionnaires (not to be confused with the unofficial Wolf report questionnaires). The court went on to castigate Chancellor Bromery for giving these much weight, finding as a fact that favorable peer assessments of Kumar's teaching were more reliable indicators of his teaching skill than were the student evaluations.

It was not the court's prerogative to make this judgment. Chancellor Bromery testified that, in his opinion, at a public institution like the University of Massachusetts the most important of the three tenure criteria

> "is teaching because we have an obligation to the Commonwealth and to the citizens of the Commonwealth to teach the students in the classroom."

He went on to defend the importance of student evaluations, saying,

> "The students, I think, are probably the only ones in a classroom that know whether they are learning anything."

Bromery gave less weight to a favorable teaching evaluation made by one professor who sat in on Dr. Kumar's class,

> "because a Professor goes in equipped with considerably more knowledge than the graduate student or undergraduate sitting in front of the Professor, and the reason why we are in business at the University of Massachusetts is to transmit knowledge to those students."

Bromery's views were in opposition to those expressed by many of Kumar's faculty colleagues and by a faculty committee, who downgraded student evaluations as too often reflective of a student's short-term interests and, possibly, the kind of grades the student was getting. Kumar's colleagues believed that his teaching and course materials were good; in their view the unhappiness of many beginning students stemmed from the fact that Kumar was a financial theorist and required a mathematical approach.

Whatever the actual truth of the matter—and the subject is one on which a single answer is unlikely—the Chancellor clearly had a right to determine that Kumar was not, in his view, an excellent teacher or even a good one, given the Chancellor's opinion that student evaluations were important and that teaching was critical. There was ample support for a low teaching evaluation notwithstanding other contrary evidence. Associate Provost Bischoff testified that student evaluations in print-outs in Kumar's initial tenure file were "some of the lowest I had ever seen." Kumar's initial tenure recommendations suggest numerous doubts, even by those recommending him, concerning the quality of his teaching. The Dean's comment in a 1974–75 report was that, while Kumar had an outstanding year in terms of research and publication achievements,

> "[f]rom a teaching perspective, Professor Kumar is rated adequate or below adequate. He has experienced difficulty in this dimension historically. Additionally, his service contribution is generally modest. . . ."

It is true that there was also much evidence suggesting that in the advanced courses, and by some of the better students, he was well regarded as a teacher. And many peers thought his materials and methods were strong. There was also evidence of recent improvement. A different Chancellor might have reached a different result. Indeed, I am willing to concede, for purposes of argument, that Bromery could have been wrong. But our job is not to decide whether we agree with Bromery's assessment, or with his philosophy concern-

ing teaching and teacher evaluation. As Chancellor of the University, he was entitled to make educational policy choices and these, to be credible, did not have to please everyone else, nor did they have to appeal to a court. Bromery's decision that Kumar lacked strength in teaching was not so clearly bizarre, weak or otherwise unsupportable as to create a reasonable inference that Bromery was trying to cover up a discreditable reason for denying tenure.

The judge, to be sure, saw Bromery's demeanor, heard his testimony, and was not impressed. He also doubtless took account of the harshness of Bromery's evaluation that Kumar had *no* strength in teaching, where arguably Kumar had at least some strength. But given the University's right to make its own tenure decision, I do not think that an inference of pretext, which is tantamount to a finding of bad faith, can be derived simply from run-of-the-mill disagreement with the way the university's decision-makers tell their story and defend their views. The tenure decision is, by its nature, imprecise and judgmental. If a finding of "pretext" can be derived from nothing more than the judge's belief that the university's decision is not a good one, supported by an unfavorable impression of the demeanor of those delegated to make the decision, there is then little difference between the evidence needed to find discrimination and that needed to persuade a court that the university simply erred as to a tenure decision. For a reason to be found pretextual on its face it must, in Judge Aldrich's words, be "obviously weak or implausible", not merely less convincing to the judge than it was to some others.

I conclude that the Chancellor's determination that Kumar lacked strength in teaching and had only possible strength in service was not so devoid of support in the tenure record as, for that reason alone, to raise any inference of discrimination.

B. *Specific Incidents Bearing on Discrimination Claim*

1. *Professor Whiston's Case*

In the labor decisions referred to earlier, this court indicated that an employer's rea-son may be found pretextual if the reason the employer asserts is "manifestly unequally applied." *Eastern Smelting*, 598 F.2d at 670–71. Thus, if the University's formal requirements for tenure were applied to the last syllable in Dr. Kumar's case but relaxed in others, an adverse inference could be drawn.

The district court hinted that the granting of tenure to Professor William Whiston reflected such disparity in treatment, although it conceded that there was "no doubt that Whiston's and Kumar's cases were different in the issues raised concerning their qualifications."

In fact, the two cases are not only entirely different, but Whiston's strengths lay in precisely those areas—teaching and service—in which Kumar was weakest. At the departmental level, Whiston received an adverse tenure recommendation from a majority of the personnel committee because of doubts about his research and publications, although his excellence in teaching was universally conceded. Thereafter, the School of Business Administration's personnel committee and its Dean enthusiastically supported him as a "master teacher" and also as demonstrating excellence in service (he had served on national committees of various sorts, on key committees of the school, as an advisor to the National Science Foundation and Department of Commerce, as editor of the business school's publication, and as an advisor to businessmen and public administrators). The dean described him as the single most visible source of favorable publicity for the business school in the New England press.

One of Bromery's primary reasons for rejecting Kumar was his belief that teaching was the most important criterion in tenure decisions. Whiston, conceded by all to be an excellent teacher, would have been a man after Bromery's heart in this regard, and the fact that he was granted tenure demonstrates the University's consistency, not its inequity, on the score.

The district court perceived inequity in the fact that Whiston was "helped" at

higher levels of the tenure process after getting off to a shaky start, while the addition of further harmful information hurt Kumar's tenure application at these higher levels. Kumar did receive some help as he went on, however; and in any case Associate Provost Bischoff clearly had serious problems with Kumar's application early in the process on the basis of the lackluster initial endorsements and Kumar's apparent teaching weaknesses. It was certainly not unkind of Bischoff to ask for more information rather than to reject him outright. Dean Odiorne's subsequent letter, generally positive, included reference to the Wolf data and was not as enthusiastic as the dean's later endorsement of Whiston. The court below suggests that because adverse viewpoints were passed along as to Kumar's application but not as to Whiston's, there must have been a double standard. I do not see why this follows. The two men were altogether different, had different constituencies, strengths, weaknesses and images, and attracted different responses. I can see no basis for inferring that Kumar's race or nationality was a determining factor.[2]

Whiston's case sheds interesting light on the view expressed by two faculty members, not credited by the district court, that emphasis on teaching was a "pretext" because normally the "real emphasis" in tenure decisions was on research and publications. This view seems at variance with the granting of tenure to Whiston, an excellent teacher, but a doubtful scholar. No tangible evidence was provided to support the view that the Chancellor's emphasis on teaching ability as a tenure criterion was a pretext. There was no evidence that Bromery or the other administrators who rejected Kumar had in other cases preferred scholars to teachers.

I conclude that the evidence concerning Whiston, far from showing an improper disparity in treatment, confirms the non-pretextual nature of the reasons advanced by the University for denying tenure to Kumar.

2. *The Wolf Report*

The "Wolf Report" was a memo from Associate Dean Wolf of the school of Business Administration reflecting 24 M.B.A. students' ratings of Dr. Kumar's teaching stemming from their participation in BA 606, a basic course taught by Kumar. The survey was not scientifically done. Though the comments were highly critical, they were not in any way racist. The underlying questionnaire had been prepared by the Graduate Business Association (GBA), a student group interested in improving the administration of the school; and was designed to survey student reaction to various business school teachers. The answers about Kumar were furnished to Associate Dean Wolf when Odiorne, Dean of the Business School, was seeking more feedback on Kumar's teaching at the request of Associate Provost Bischoff. At the time, Bischoff was reviewing the favorable tenure recommendations received from the business school and from Kumar's department. His initial reaction, conveyed to Dean Odiorne, had been negative: Bischoff wrote that he could not "find convincing evidence for strength in either teaching or service", and said he would recommend against tenure unless his perception could be changed. He made this statement before seeing the Wolf report data and testified he knew nothing of the GBA group at this time.

Odiorne responded with a renewed recommendation for tenure. Along with much information favorable to Kumar, he men-

---

**2.** Dean Odiorne and others (all of whom *supported* Kumar) made occasional references to his nationality, noting, for example, that he was "foreign born" and that "his modes of communication are not that of a native born American." This particular comment was followed by the remark, "He is perfectly lucid in his language." I agree with Judge Wyzanski that comments on the ability of a teacher to communicate with his students are proper and are not violative of the law. Here they were made by people who favored the granting of tenure, whereas those officials who did not favor tenure did not make any such references. I thus fail to see how this can be seized upon as reflecting racial bias in the adverse tenure decision.

tioned the unfavorable student evaluations of Kumar's teaching contained in the Wolf Report.

When Kumar learned of the Wolf Report, he pointed out the unscientific nature of the survey and asserted that under the University's practices it did not belong in his tenure file. When Chancellor Bromery reviewed Kumar's application in 1979, he was under explicit instructions not to consider the Wolf Report data and he expressly said he did not do so.

Later Dean Odiorne dramatically transformed the nature of the debate over the Wolf Report from one concerning its unscientific and unofficial nature to one concerning implicit racism. The Dean told an E.E.O.C. investigator that he had overheard from outside the room comments made at a meeting of the GBA—the group that later prepared the survey culminating in the Wolf Report—in which Dr. Kumar was referred to as "the little gook" and "that black bastard". There were also comments that "he has to go". Odiorne noted that the president of the group had had serious academic difficulty in Kumar's course. The Dean stated,

"... I saw no direct evidence whatsoever of racism in Whitmore [the university's administration building], only to the extent that subsequently the personnel decision on Kumar lent credibilty and weight to evidence generated by this student group. In my opinion, that evidence is properly impeachable evidence."

Odiorne went on to say that the student group in question actively and persistently pursued the mission of getting rid of Dr. Kumar. He felt that it managed to "reach" some administrators, including himself, although he declined to give weight to their views. Odiorne (who supported Kumar throughout) opined that a

different decision would have resulted in Kumar's tenure case had it not been for the activities of this group. The Dean described the GBA as being "rightly concerned about the quality of teaching and improvement of the quality of teaching". But, he continued,

"There were a couple of members of the group ... who fastened upon Kumar as being a particular target for the improvement of teaching in the school."

These students referred amongst themselves to Kumar as a "black bastard" and a "gook", although they did not say that this was the reason he should be fired. Dean Odiorne was unable to identify any particular individual who had made the racial slurs. In his view, however, "calculus was more of their problem than color", since they also said that he was too rigorous as a teacher.

Dean Odiorne's is the only actual evidence of racism in the university community;[3] and Odiorne conceded he "saw no direct evidence of racism whatever" in the university administration, where the adverse tenure decision was made. The question is whether the racist remarks of "a couple of" student GBA members who opposed Dr. Kumar on grounds of his teaching can be inferred to have infected the entire tenure process, to the point of corrupting the decision of the Chancellor— himself a member of a minority group— and various other administrators.

I cannot conclude that the remarks had such an impact. Odiorne attributed the remarks to, at most, a handful of students. Even if, as seems possible, some of the student ratings compiled in the Wolf Report were infected by racism, it is by no means clear that all were. And there is simply no credible evidence that any racism

---

3. There were, to be sure, innuendos concerning racism in the testimony of two supporters of Dr. Kumar, Professors Osborn and Ludtke. It was intimated, for example, that a tenured professor named Pao Chang may have left the university because of a sense that Asians were not well received; there was also some suggestion that Ven Katesan's prospects were harmed by rac-

ism. Most or all of this testimony was inadmissible hearsay and opinions constituting no more than the witnesses's speculations. I do not think that these innuendos, which were never fleshed out in any meaningful way, can be regarded as evidence tending to establish that the university administrators who rejected Kumar did so for racist motives.

that may have affected the Wolf report affected Chancellor Bromery.

Chancellor Bromery testified that while he had at one time read the Wolf Report, he recognized it for what it was, and, "I put little credence in an individual faculty member or individual administrator who has no role in this decision going off on their own and gathering their own information, which they want to insert in the report."

Moreover, it was unnecessary to go to the Wolf Report to find low student ratings of Kumar's teaching. Bischoff's concern over Kumar's teaching arose before the Wolf Report had surfaced. In his final decision the Chancellor was under express injunction to ignore the Wolf Report. Only if we assume, on no evidence except the fact that he rejected the tenure application, that the Chancellor betrayed this trust, is it possible to affirm the lower court.

The Chancellor testified that he saw no sign of racism in the file. He said, "Of course, everybody who makes a negative decision, one could interpret that [as racism], but I could see nothing in the material that I considered in making my judgment with the Provost on those three areas were racist, so that I could understand them, and I believe that I would have a sensitivity, maybe more so than the average person to subtle racism, but one can't read what is in the mind of a student's evaluation or a faculty member that evaluates their peers."

I conclude that the evidence of racism on the part of a few students is insufficient grounds, on this record, to find that the University denied tenure on grounds of race or national origin.

### 3. *Procedural Errors*

Many claims were made of procedural and bureaucratic skulduggery, or at least sloppiness, and some instances may have occurred. Kumar asserted that at various times when he inspected his tenure file important papers favorable to his cause were missing, presumably because they were elsewhere in the administrative office. Nearly all of the papers were eventually restored. By the time of the final review by Chancellor Bromery in 1979, the file seems to have been largely complete. While misplacement of these papers may reflect sloppiness and inefficiency, it is difficult to believe that someone having racist inclinations would have deliberately set about denuding the file, nor are the omissions explained on any such basis.

The other procedural claims seem to me similarly unpersuasive as evidence of racism. It appears that Kumar's case was surrounded by in-fighting for and against his retention. There is no evidence, however, that faculty members who opposed him did so because of his race or nationality as opposed to their sincerely-held personal convictions, right or wrong; nor that alleged procedural errors in the tenure process were the result of racial bias. Dean Odiorne stated that he did not perceive any racism to exist at the administrative levels of the University. If it did, there was no evidence of it. There was no statistical evidence that blacks, Asians, or foreigners generally have fared badly at the University, either as to tenure or otherwise. There was no evidence that the individuals who played the major roles in Dr. Kumar's tenure decision had a record of racism or discrimination.

### III. *Conclusion*

I conclude that the district court was clearly erroneous in its finding of discrimination. I vote to reverse the judgment of the district court.

COFFIN, Circuit Judge, dissenting.

I disagree with my brothers' conclusion that the district court clearly erred in finding that Dr. Kumar was denied tenure because of his race and national origin.

In the very complex and nuanced environment of university tenure decisions, a discrimination case with no "smoking gun" evidence can be excruciatingly close for the district court. Because universities may deny tenure for minor reasons and for seemingly wrong reasons, the district court must take care to consider only whether

the University denied tenure for discriminatory reasons. It must stay away from the larger question of whether the University should have denied tenure in the case. At the same time, however, it must not shrink from a finding of discrimination when appropriate, on the ground that the issue of tenure is so subjective that a court can never conclusively determine whether improper motivations played a role in the decision.

With those boundaries in mind, I am unable to say that the district court committed clear error.* Although there were, to be sure, several less than effusive descriptions of Dr. Kumar's abilities contained in his tenure file, the overwhelming bulk of the file depicted a worthy candidate. The University apparently rested its decision largely on negative impressions of Dr. Kumar's teaching, but much of that criticism was challenged for the simplistic evaluation process used and, more importantly, because certain evaluations suffered from possible racist taint. The district court could have found that the student conversations and evaluations that reflected a racist motivation infected the decision-making of the higher University officials. This scenario is particularly plausible in light of the University's failure to remove the faulty Wolf Report from Dr. Kumar's file and the absence of existing positive documents from his file at critical stages of the tenure review procedure. Reliance on these not inconsiderable factors cannot, in my opinion, be dismissed as "reliance on pure atmospherics". Moreover, the district court had the opportunity to hear and see the witnesses—a factor which in my view my brothers too heavily discount.

The very meticulousness of my brothers' opinions causes me to add this note of concern. Although our review must ascertain that the district court gave due deference to university decision-making, replicating in such detailed fashion the weighing of each item of evidence runs the substantial risk of leaving no room for any deference to the district court itself. My view of the evidence is that, whether or not I would agree with the district court's conclusion, I cannot say that it was clearly erroneous.

---

* Like Chief Judge Campbell, I believe the proper scope of review embraces the same time frame as the district court considered. I agree with his analysis of this issue.