Cyrus BINA

v.

PROVIDENCE COLLEGE, et al.

Civ. A. No. 91–0264 P.

United States District Court,
D. Rhode Island.

Feb. 17, 1994.

Robert B. Mann, Mann & Mitchell, Harold E. Krause, Jr., Providence, RI, for plaintiff.

Marifrances K. McGinn, William F. McMahon, McMahon & McMahon, Providence, RI, for defendants.

## OPINION AND ORDER

PETTINE, Senior District Judge.

The plaintiff, whose country of origin is Iran, contends that ethnic discriminatory animus motivated the defendants to deny him a tenured teaching position in the Economics Department of Providence College. He brings this action pursuant to 42 U.S.C. § 2000e et seq. (1988) (Title VII), R.I.Gen. Laws § 42–112 et seq. (1990), 42 U.S.C. § 1981 (1988), and 28 U.S.C. §§ 1332(a) and 1343 (1988). Dr. Bina also brings a claim for breach of contract and, in doing so, invokes this court's pendent jurisdiction. 28 U.S.C. § 1367 (1990).

It is not disputed that jurisdiction is properly invoked since all conditions precedent thereto under 42 U.S.C. § 2000e et seq. have been complied with and the complaint was filed within 90 days of receipt of the Notification of Right to Sue by the plaintiff.

### I.

The following facts pertain only to the accusation of ethnic discriminatory conduct and the scene giving rise to this complaint.

After completing undergraduate and graduate studies in Iran, the plaintiff, Dr. Crus Bina, attended The American University in Washington, DC where, in 1982, he received a Ph.D. degree in economics. He then embarked on a teaching and research career for approximately the following five years. During the summer of 1987, he came to Providence College in response to a nationally advertised search for an adjunct faculty appointment in the Department of Economics and was interviewed by Dr. Francis P. MacKay, the Vice President for Academic Affairs; as a result, he was appointed an adjunct associate professor and started teaching in September of 1987, thus becoming eligible to compete for a tenure track position. During the 1987–1988 academic year, such an opening occurred for the following year. Dr. Bina applied. The college did not conduct any search since Dr. William J. Simeone, Chair and associate professor of economics at the college, and members of the Economics Department, unanimously voted to recommend Dr. Bina for the position; this

vote occurred in April of 1988. This recommendation was forwarded to the Committee on Academic Rank and Tenure (CART). The CART met in April of 1988 and voted nine to zero against the appointment. Because of that rejection, Dr. Simeone and a Dr. O'Brien, the former chair and senior member of the Department of Economics, met with Father John Cunningham, President of the college, and asked him to overrule the CART; Father Cunningham replied that he could not do that but would approach Dr. MacKay, who was chairman of the CART, and request that Dr. Bina's application be reconsidered. Father Cunningham testified that he had been President since 1985 and that "he [could] count on one hand without using all [his] fingers how many times" he had made a similar request. Tr., 8/19/93 at 45.

On June 23, 1988, the CART reconsidered Dr. Bina's application. On June 26, 1988, the CART voted four to three in favor of the appointment, reversing the nine to zero vote against the appointment that had occurred in April. However, this does not mark "finis" to the story.

On June 27, 1988, Dr. MacKay sent a letter to Dr. Bina extending him an invitation "to join the Ordinary Faculty of Providence College for the academic year 1988–89" as an Associate Professor of Economics. It is worthwhile to note the balance of the letter in full:

> Since you will have completed 6 years of full time teaching at the conclusion of this academic year, this will be recognized in the calculation of the length of your probationary period which Providence College will set at 4 years. Under this schedule, you will be considered for a letter of intent to grant tenure during your second year (1989–90) at Providence College on the Ordinary Faculty, but tenure and its privileges would not be conferred until the four year probationary period is completed.
>
> The offer is considered open and valid for 10 days from the date of this letter. When you let us know in writing that our offer is acceptable to you, I shall be glad to send you a contract.

Pl.'s Ex. 21.

Dr. Bina was unhappy with the four year probationary requirement so he did not accept the offer.[1] Instead, he contacted Dr. Simeone; this, in turn, led to a meeting with Father Cunningham on July 1, 1988. At this meeting Dr. Bina expressed his displeasure, but to no avail. Father Cunningham, though President of the College, had no authority to overrule the CART, and so he urged Dr. Bina to see Dr. MacKay. Dr. Bina testified that immediately after his July 1 meeting with Father Cunningham, he saw Dr. Mac-Kay's secretary and asked to see him; by July 7, he received no reply; he then sent a memorandum to Father Cunningham. That memorandum reads:

> As you have advised me, I have asked Dr. MacKay's secretary, immediately after my departure from your office on Friday, July 1st, to make a joint appointment for Dr. Simeone, Dr. McGovern, and myself in order to discuss the issues pertaining to the circumstances of my initial recruitment, the commitment of the College, and total mishandling of my case, particularly concerning the matter of my tenure and rank, during the 1987–88 academic year, culminated in Dr. MacKay's appointment letter of 27 June, 1988.
>
> Unfortunately, till the time of writing of this memo, I have not heard from him.

Pl.'s Ex. 23.

On July 11, Dr. Bina received a note from Dr. Simeone advising him that a meeting had been scheduled with Dr. MacKay for July 26, 1988. At this meeting, Dr. Bina argued that he had been promised an immediate tenure track position without the need to satisfy any precedent conditions of probation. Dr. Mac-Kay stood fast behind the original offer agreed upon by the CART; he urged Dr. Bina to accept the offer, but Dr. Bina still did not do so.

On August 3, 1988, Dr. Bina received the following written communication from the

---

1. A four year probationary service in teaching at Providence College as a requirement for any grant of tenure is customary. Every tenured Ordinary Faculty member at Providence College has served this probationary period prior to being tenured.

Associate Vice President James H. Mc-Govern:

> In his absence from the college, Dr. Mac-Kay has authorized me to inform you that, since no written response has been received in his office as of this date to the June 27, 1988 offer inviting you to join the faculty of Providence College at the rank of Associate Professor of Economics, the offer has expired.
>
> However, the pre-existing three year commitment dated July 28, 1987 remains in effect and you will be forwarded a contract as Adjunct Associate Professor for the 1988–89 academic year and the one to follow.
>
> If this does not conform to your understanding, Dr. MacKay will be pleased to discuss your concerns upon his return on August 16, 1988.

Pl.'s Ex. 24.

On August 11, 1988, Dr. Bina again appealed to Father Cunningham; Dr. MacKay responded to this appeal on August 29, 1988. This response clarified Dr. Bina's status and stated, in part, "By letter of June 27, 1988, an offer was made to you which was open for a ten day period. At our meeting of July 1, 1988 by demanding immediate tenure and a full professorship, you rejected the terms of the June 27, 1988 offer, which, therefore, expired by its own terms and, even had it not expired, would have been rejected by your August 11, 1988 letter to Father Cunningham." Pl.'s Ex. 26. The August 11, 1988 correspondence was a long detailed document that did nothing more than argue Dr. Bina's position and even in this letter he did not accept the offer that was made to him.

It was not until August 31, 1988 that Dr. Bina attempted to accept the offer of June 27, 1988. He wrote a letter to Dr. MacKay stating that he agreed "to accept the offer of the tenure track position which has been extended to me in your letter of July 27, 1988 . . ." and he then stated that in doing so he was not waiving any of his rights and remedies concerning his employment. Dr. Bina then met with Father Cunningham on Sep-

tember 2, 1988. He was told the offer of the tenure track position had expired, but that he could still sign a contract for the position of adjunct associate professor which he did. At this point the relevant events of 1988 came to a close.

On May 30, 1989, the CART, now composed of three new members and four of the members who had attended the other meetings,[2] again considered Dr. Bina for a tenure track position. By a vote of four to three, the committee decided against offering the position to Dr. Bina. It is unclear whether the position was then given to someone outside the protected class or remained open and unavailable. At any rate, one or the other occurred.

Within the travel of this case, as I have set forth, the plaintiff focuses on certain specific conduct as unquestioned proof of his complaint. He begins by stating that it is of no consequence that he was offered a tenure track position in 1988 since no such offer was made in 1989. In other words, although the defendants' hiring practice in 1988 may not be blemished with an ugly stain of discrimination, it does not mean their conduct in 1989 was not discriminatory. Dr. Bina contends that in 1989 a prima facie case was established, and so it follows he should prevail since in 1989 the defendants failed to articulate a non-discriminatory reason for denying him tenure.

The plaintiff's entire case, as he admits, Tr., 8/19/93 at 72, falls four square within a few specific items of evidence. The case is based upon the minutes of the three CART meetings of April 29, 1988, June 26, 1988, and May 30, 1989, as well as the fact that from 1986 through 1991, only two people were ever recommended for appointment to the Ordinary Faculty and not accepted. One was a person who by the terms of the minutes had no research at all and the other was this plaintiff.

The defendants, in answer to the Court's inquiry of why Dr. Bina was not offered tenure, replied:

---

**2.** It is interesting to note the four old members were all deposed by the plaintiff but not called by

the plaintiff to testify.

Your Honor, CART is secret ballot. I have no idea why. It was the CART Committee and they made a decision in June of 1988. It was four to three in favor. In 1989 it was four to three against. I do not know why they decided the way they decided in either case.

*Id.* at 74–75.

The defendants argue that the minutes of the three meetings in question show that the committee was concerned about Dr. Bina's ability to communicate with the students, "[n]ot only communication verbally but communication of ideas." *Id.* at 76. The minutes show that during the fall semester of 1987, the students' evaluation of Dr. Bina was below average; however, during the spring semester of 1988, the evaluations were above average. During the fall semester of 1987 and the spring semester of 1988, the faculty rated Dr. Bina at average and above average. The defendants also point out that Providence College has two other Muslims on their teaching staff, one from India and another from Afghanistan.

As is evident, two of these meetings were in 1988; the June meeting vote was in favor of offering tenure track to Dr. Bina, yet he points to both these meetings as evidence of discriminatory animus.

It appears Dr. Bina may have felt he should have been afforded an opportunity to appear before the CART. However, the faculty manual for Providence College does not grant persons being considered for a tenure track position the right to appear before the CART. Nor is there any written or unwritten policy that identifies under what circumstances a person being considered for a tenure track position may so appear. In fact, Dr. Bina never did appear before the CART.

Dr. Simeone did appear before the CART at the June 1988 meeting and told them Dr. Bina was well published and that lack of publications was one of the major weaknesses of the Economics Department. He informed the CART that one of the reasons the Department of Economics wanted to hire Dr. Bina was that he would be able to assist other members of the faculty with respect to publications.

As to his ability to communicate effectively, Dr. Bina presented the testimony of Professor Peter Goodrich, an Associate Professor in the Department of Management at Providence College, Professor Yngve Ramstad of the University of Rhode Island, and other professors who had been exposed to Dr. Bina. All were of the opinion that Dr. Bina spoke "very clearly" and communicated very effectively. Tr., 8/18/93 at 37, 40, 59–61; Professor Roy Mottahedeh Dep. 8/12/93 at 24.

I have reviewed the minutes of the three CART meetings mentioned above. The minutes of the meeting of April 29, 1988 consist of three pages. The committee discussed Dr. Bina's publications, including "a quite impressive" book, "The Economics of the Oil Crisis;" problems in the classroom between Dr. Bina and a student; negative teaching reports; and evaluation of his prior teaching experience. Pl.'s Ex. 19 at 4. The plaintiff argues that these minutes reveal two sentences which show discriminatory animus. "Dr. Carlson said that Dr. Bina seems to have some problems in communication because of his foreign accent and his different cultural background." *Id.* "Father Keegan suggested that our students are not often exposed to people with different cultural and linguistic backgrounds, and this could lead to a lack of understanding of Dr. Bina and his cultural perspective." *Id.*

The meeting of June 26, 1988 was called at the request of Father Cunningham. There was extensive discussion concerning the propriety of reconsidering their prior ruling and Dr. Bina's qualifications as a teacher and a scholar. As I have stated, Dr. Simeone appeared before the committee and offered many positive reasons for a favorable reconsideration of Dr. Bina's appointment and further stated that his department was determined "to inform Dr. Bina where and how his teaching could be improved." Pl.'s Ex. 20 at 1. The committee concluded that the new student evaluations they reviewed and Dr. Simeone's "new and different information" about Dr. Bina justified reconsideration. The committee voted in favor of reconsideration, followed by a four to three vote in favor

of offering Dr. Bina the tenure track position.

The minutes of the meeting clearly reflect the objective and legitimate issues discussed by the committee. Nevertheless, in spite of the favorable vote, the plaintiff culls out one statement by Dr. Simeone, the man who went before the committee in support of Dr. Bina, as indicative of discriminatory animus—"Dr. Bina is a man with a large ego from a different cultural background." Pl.'s Ex. 20 at 2.

3. COMMITTEE ON ACADEMIC RANK AND TENURE MINUTES
30 MAY 1989
3. Crus Bina—Appointment to the Ordinary Faculty
summarized Dr. Bina's qualifications. It was noted that even though Dr. Bina's teaching has improved, and prospects for research look good, he has only one refereed paper to his credit. Also noted was the fact that Dr. Bina was offered a tenure track position last year, but he failed to respond to the offer in the time allotted. It was moved by and seconded by to
recommend to the President that Dr. Crus Bina be appointed to the faculty of Providence College in the rank of Associate Professor of Economics commencing with the academic year 1989–90.
asked why only the tenured members of his department were given the opportunity to vote on Dr. Bina's switch to a tenure-track position. said that in such cases those members in the department in the rank of associate and above usually vote on such cases. said that it would have been helpful to know the opinions of those in the Economics Department also on tenure tracks.
said, in spite of some ambivalence, he supported Dr. Bina request last year. noted that original request claimed that Dr. Bina would serve as a good role model for the department, and his presence would definitely improve research of others in the Economics Department. said that also claimed in his request that Dr. Bina's teaching would significantly improve with upper level courses. said he again approaches the request with some ambivalence and asked if the Economics Department would be granted another position if we voted against Dr. Bina's request to be placed on a tenure track. said that he could see no reason not to grant such a request if it was requested.
noted that in the Economics department's most recent search to fill a tenure track position some of the candidates had very impressive credentials and appeared to be excellent teachers, and asked if Dr. Bina was considered in that search.

As I have stated, the CART met again on May 30, 1989 to consider Dr. Bina for a tenure track appointment. In the meeting of May 30, 1989, the committee voted four to three to deny Dr. Bina such an appointment. No reference was made to Dr. Bina's cultural background; there is not one shred of discriminatory animus revealed in the minutes of this meeting; the members only discussed Dr. Bina's qualifications. Since this is a pivotal piece of evidence, that is, the only evidence relative to 1989, the minutes are noted in full.[3]

said that as far as he knows, Dr. Bina was not considered.
said that he was also ambivalent with this request and was concerned with the added pressure put on Dr. Bina to act as a role model to others in his department. thought that members of his department would have taken a greater role as mentors in assisting Dr. Bina with his teaching difficulties. also noted that he didn't think that the member of the Economics Department would have put Dr. Bina up for tenure if they didn't think that his teaching had improved considerably.
asked about Dr. Bina's failure to accept the committee's request last year. wanted to know if thought that Dr. Bina was trying to give him or us a message.
said that in his opinion Dr. Bina acted as if he was doing us a big favor by agreeing to teach at the College in the first place. then asked, if we approve the motion, when will Dr. Bina be coming up for tenure. said that it would probably occur two years from now.
asked specifically what has Dr. Bina done for the College during his tenure here.
said that he has reviewed a paper for a colleague. asked why Dr. Bina wasn't granted a tenure track position in the first place. said it was because it was a late-summer appointment.
evaluation of Dr. Bina's teaching were discussed. It was felt by the committee that comments were informational and not based on personal prejudice.
noted that Dr. Bina's work was more theoretical and less quantitative in nature than noting that also was that type of economist, and he and got along very well.
questioned again whether or note Dr. Bina's teaching had really improved significantly. said that the numbers certainly look better. wondered whether or not they were statistically significantly better.
said, and others agreed, that Dr. Bina is very hard to understand at times and often appears disorganized when lecturing to an audience.
A vote on the motion was taken by secret ballot. The motion failed to carry.
In favor 3
Opposed 4

The plaintiff's key argument that judgment should enter for him is that the defendants never articulated a reason for the decision not to offer plaintiff a tenure track position in 1989. In addition, he maintains that even if this is not the case, there is, when viewed in its entirety, ample evidence in the record from which discrimination can be inferred. He claims he was treated differently than most persons: "[E]xcept for Dr. Bina, there was only one other case in which CART did not approve a request for appointment to the ordinary faculty ... that person was an accountant with no scholarly production." Pl.'s Proposed Findings of Fact and Conclusions of Law at 24; in addition, for the first time in 29 years the Economics Department unanimously recommended a candidate, but despite this strong support, CART voted against a tenure track appointment, "Every other person whose department supports their appointment to the ordinary faculty, who has scholarly production, is approved." *Id.* at 25. I add that these facts do appear in the record.

The defendants base their case as to discrimination on the contention that the plaintiff never established a prima facie case, that is, in 1988, the plaintiff was offered a tenure track appointment which he refused.

> Having made the offer once, the discrimination factor is eliminated as a matter of law. No case or legal authority holds or suggests the contrary. The undisputed fact that the offer was made establishes that the plaintiff was not rejected for the position and, therefore, the evidence never reached the prima facie "threshold...." Since he was not rejected, the plaintiff has not crossed the threshold requiring any explanation or justification for the failure to make a second offer after the first was not accepted.

Defs.' Post–Trial Reply Br. at 1–2.

## II.

■■■ This case is purely an evidentiary one and requires no exegesis of the law; a cursory review suffices. The elements of a prima facie case were set forth in *McDonnell*

*Douglas Corp. v. Green,* 411 U.S. 792, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973) and rearticulated in *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). In order to make out a prima facie case, the plaintiff must show:

> (1) that he is a member of a protected class under Title VII;
>
> (2) that he was a candidate for tenure and was qualified under the standards, practices or customs of Providence College;
>
> (3) that despite his qualifications he was rejected; and
>
> (4) that the tenure position in the Department of Economics was open at the time plaintiff was denied tenure, in that someone else was granted tenure in the department during a period relatively near the time this plaintiff was denied tenure.

*See also Fields v. Clark University,* 966 F.2d 49, 51 (1st Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 976, 122 L.Ed.2d 130 (1993).

> The plaintiff must prove by a preponderance of the evidence that she applied for an available position for which she was qualified, but was rejected under circumstances which give rise to an inference of unlawful discrimination.

> . . . . .

> If the trier of fact believes the plaintiff's evidence *and if the employer is silent in the face of the presumption,* the court *must* enter judgment for the plaintiff because no issue of fact remains in the case.

> The burden that shifts to the defendant, therefore, is to rebut the presumption of discrimination by producing evidence that the plaintiff was rejected or someone was preferred, for a legitimate, nondiscriminatory reason."

*Burdine,* 450 U.S. at 253–255, 101 S.Ct. at 1093–94 (emphasis added) (footnote omitted). The defendants need not prove they were actually motivated by the proffered reasons.

In *McDonnell Douglas,* the court stated that a prima facie case may be established by showing the four criteria recited *supra.* It also stated, "[t]he facts will vary in Title VII

cases and the specifications [as recited *supra*] of the prima facie proof required from respondent is not necessarily applicable in every respect to differing factual situations." *McDonnell Douglas, supra,* 411 U.S. at 802 n. 13, 93 S.Ct. at 1824 n. 13.

Here, the plaintiff claims that he made out a prima facie case of Title VII ethnic discrimination, as required by the aforesaid United States Supreme Court cases. And as Providence College remained silent in the face of the presumption, I have no alternative but to direct a verdict for the plaintiff. I do not agree; both sides have submitted evidence which, taken as a whole, militates against a directed verdict; I must look to this entire record to decide whether the defendant intentionally discriminated.

"[T]he critical determination in any Title VII suit is whether the complainant has proven by a fair preponderance [the existence of intentional discrimination].... That principle requires [me] to focus not on the artificial striations of the burden-shifting framework, but on [the ultimate issue of discrimination]."

*Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 155 (1st Cir.1990). *Dragon v. State of R.I. Dept. of MHRH,* 936 F.2d 32, 36 (1st Cir.1991).

Before analyzing the facts, I will put at rest an issue raised during oral argument: must the plaintiff prove that the position was filled by a person not in the protected class? The First Circuit has categorically stated:

"[W]e have never held that the fourth element of a prima facie discharge case can be fulfilled only if the complainant shows that she was replaced by someone outside the protected group. Indeed, we have said precisely the opposite....

Today, we set any uncertainty to rest and rule that, in a case where an employee claims to have been discharged in violation of Title VII, she can make out the fourth element of her prima facie case without proving that her job was filled by a person not possessing the protected attribute.... (citations omitted) ... a complainant can satisfy the fourth prong of her prima case simply by showing that, as here, the employer had a continued need for "someone

to perform" the same work after [the complainant] left."

*Cumpiano v. Banco Santander Puerto Rico,* 902 F.2d 148, 155 (1st Cir.1990).

### III.

Painfully I repeat, the plaintiff claims he is a member of a protected class; was a candidate for tenure; no one seriously contested that he was a qualified applicant who sought an available position; Dr. Simeone, who was Chair of the very department in which he was to be appointed appeared before the CART and urged that they favorably consider him; for the first time in twenty-nine years, the entire Economics Department unanimously voted to recommend a member of its department for a tenure track appointment. And the plaintiff contends the ethnic discriminatory animus can and must be inferred from the way he was treated and the comments made about him; from 1986 through 1991, except for Dr. Bina, there was only one other case in which the CART did not approve a request for appointment to the Ordinary Faculty and that person was an accountant with no scholarly production; every other person who was supported by their department was approved except the accountant; and the comment in the three CART meetings which I have already recited.

On the other hand, the defendants argue that all the 1988 events on which the plaintiff rests are of no avail since Dr. Bina was indeed offered a tenure track position in 1988 which he did not accept; thus, this refusal of the job offer in 1988 negates any possible claim of discriminatory animus. And as to 1989, the CART minutes clearly show that the committee members, newly constituted, were only concerned with Dr. Bina's qualifications. This committee, with new evidence and the benefit of being able to evaluate an additional year of teaching by the plaintiff, concluded he should not be offered a tenure track position.

As can be seen, the minutes of the May 30, 1989 meeting, quoted *supra,* questioned whether Dr. Bina's teaching ability had really improved; though the numbers looked better, they agreed he was hard to under-

stand and appeared disorganized when lecturing to an audience. As I read these minutes, the committee members were only concerned with Dr. Bina's qualifications, scholarly and otherwise. It is evident the pros and the cons were brought to the front and weighed. Their ultimate conclusion is evident in the four to three vote against a tenure track offer.

The ultimate burden of persuading the trier of fact that the defendant intentionally discriminated against the plaintiff remains at all times with the plaintiff.

*Burdine,* 450 U.S. at 253, 101 S.Ct. at 1093.

■ There is no question a court must act with restraint in tenure cases. Special care must be taken to preserve the teaching institution's autonomy:

> [C]ourts must be extremely wary of intruding into the world of university tenure decisions. These decisions necessarily hinge on subjective judgments regarding the applicant's academic excellence, teaching ability, creativity, contributions to the university community, rapport with students and colleagues, and other factors that are not susceptible of quantitative measurement. Absent discrimination, a university must be given a free hand in making such tenure decisions.

*Kumar v. Board of Trustees, University of Massachusetts,* 774 F.2d 1, 12 (1st Cir. 1985) (Campbell, C.J., concurring), *cert. denied,* 475 U.S. 1097, 106 S.Ct. 1496, 89 L.Ed.2d 896 (1986). At the same time, however, an employee's right not to be denied tenure for discriminatory reasons prevents insulating the tenure process from any judicial review. As in other forms of employment, an inference of discrimination can be derived from a showing that a university's given reasons for denying tenure to the plaintiff were "obviously weak or implausible," or that the tenure standards for prevailing at the tenure decisions were "manifestly unequally applied." *Id.* at 15. The essential words here are "obviously" and "manifestly." A court may not simply substitute its own views concerning the plaintiff's qualifications for those of the properly instituted authorities;

the evidence must be of such strength and quality as to permit a reasonable finding that the denial of tenure was "obviously" or "manifestly" unsupported. In this case, Brown's burden was to show that the University *manifestly* applied an unequal standard to her tenure application.

*Brown v. Trustees of Boston University,* 891 F.2d 337, 346 (1st Cir.1989).

The plaintiff contends that if I go to the record, I should consider the 1988 events. To begin with, I find that no discriminatory animus can be concluded from the minutes of April 29, 1988, or June 26, 1988, if for no other reasons than the fact Dr. Bina was offered a position in 1988. The statements isolated by the plaintiff, set forth *supra,* are taken out of context and to me, may have been inappropriate but reflect no discriminatory animus. The comment in the May 1989 minutes, "Dr. Bina acted as if he was doing us a big favor by agreeing to teach at the College in the first place," may reflect a dislike for Dr. Bina's attitude, but it would be a rather wild stretch to say such a comment reflects ethnic discriminatory animus. Furthermore, rapport with students and colleagues is a legitimate inquiry.

As to Father Cunningham, he certainly must be exonerated. He was controlled by the findings of the CART and not a shred of discriminatory ethnic animus can be attributed to him. The same is true as to Dr. MacKay.

This now takes me to the May 1989 meeting. Have the defendants, through these minutes, clearly set forth reasons for the action they took? And finally, weighing all this evidence, has the plaintiff met his burden to show that Providence College manifestly applied an unequal standard to his tenure application?

As I have already stated, the May 1989 minutes clearly reflect an objective appraisal of Dr. Bina's qualifications, totally divorced of any ethnic bias. The majority vote lends itself to only one conclusion: they did not find him qualified. Simply because Dr. Simeone and the Economics Department felt he was qualified does not lead me to believe the majority vote of the CART was obviously

weak, implausible or that they "manifestly unequally applied" the tenure standards. The CART was the properly instituted authority to evaluate Dr. Bina's qualifications, not this court. There is no evidence in this record supporting the plaintiff's ultimate burden of persuading me that the defendants intentionally discriminated against the plaintiff.

On the issue of discrimination, there was no Title VII violation. Judgment for the defendants.

## IV.

### Breach of Contract—Pendent Jurisdiction

Federal courts no longer enjoy the broad discretionary power they had under *United Mine Workers of America v. Gibbs*, 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966) to decline entertaining pendent state law claims brought under 28 U.S.C. § 1367. It now appears the exercise or declination of supplemental jurisdiction requires the evaluation of the three comity-related and one catchall circumstances set forth in section 1367(c).[4]

The plaintiff has not prevailed in his Title VII claim and so I must now consider the breach of contract claim.

The factual underpinnings of the contract claim are as follows:

A. On June 27, 1988, Dr. MacKay wrote to Dr. Bina and advised him that he had been empowered by the CART to extend to him an invitation to join the Ordinary Faculty of Providence College for the academic year 1988–89 as an Associate Professor of Economics. The letter further set forth the required probationary period that had to be completed before tenure and its privileges would be conferred. The letter concluded by stating, "The offer is considered open and valid for 10 days from the date of this letter. When you let us know in writing that our offer is acceptable to you, I shall be glad to send you a contract."

B. On July 1, 1988, Dr. Bina met with Father Cunningham concerning the June 27th offer. The ten day time period surfaced and Father Cunningham told him "that if necessary, the time could be extended for a few days." Tr. Aug. 19 at 52. He advised Dr. Bina to see Dr. MacKay.

C. On July 7, 1988 (the 10th day), Dr. Bina sent a letter to Father Cunningham informing him that though he tried to get an interview with Dr. MacKay, he had been unsuccessful. Ex. 23.

D. On July 11, 1988, Dr. Bina received a letter from Dr. Simeone that there would be a meeting with Dr. MacKay on July 26, 1988. Ex. 62.

E. At the July 26th meeting, Dr. Bina was intractable and though he was urged to accept the offer, he did not do so. Dr. MacKay testified, "If he had indicated his willingness to accept the contract at that point, I think we would have waived the time limit and allowed him to accept the position." Tr. August 17, 1988 at 56–57. There was no discussion about the ten day time limitation period for acceptance as stated in the June 27, 1988 letter. Dr. Bina kept insisting "on other terms." *Id.* at 64. True, Dr. MacKay did not tell Dr. Bina that if he did not accept the offer it would be withdrawn. As Dr. MacKay stated, "I didn't feel there was a need to say that to him because there was no indication he had—no indication whatsoever that he was prepared in any way to accept that offer. He made that very, very explicit. It was not an acceptable offer to him." *Id.* at 65.

F. On August 3, 1988, Dr. McGovern wrote to Dr. Bina, "since no written response has been received ... as of this date the June 27, 1988 offer ... has expired." Ex. 24.

G. On August 11, 1988, Dr. Bina wrote to Father Cunningham a four plus page ha-

---

4. Section 1367(c) lists the four following circumstances:
 (1) the claim raises a novel or complex issue of State law,
 (2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,
 (3) the district court has dismissed all claims over which it has original jurisdiction, or
 (4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.

rangue about his treatment, what the terms of the contract should be, the ten day limitation of the June 27 letter being "superseded" by what had transpired since he received the offer, the harshness of the August 3, 1988 letter, etc. Even in this correspondence, he did not accept the offer. He did say, "I am determined to stay and fight for my legitimate civil and academic rights to the very end, because once one's integrity is at stake one cannot walk away in peace."

H. On August 29, 1988, Dr. MacKay wrote to Dr. Bina responding to Dr. Bina's letter of August 11, 1988 to Father Cunningham. In this letter Dr. MacKay reiterates the position of the College, reviewing what had transpired between Dr. Bina and the College, clearly setting forth the correctness of its actions. Ex. 26.

I. On August 31, 1988, Dr. Bina writes and accepts the offer with reservations of his rights to "assert all my rights and remedies...." Ex. 27.

J. On September 2, 1988, Dr. Bina met with Father Cunningham. He was told that the offer of an ordinary (tenure track) position which was made to him in a letter dated June 27, 1988 had expired. He was informed "that the College's three years adjunct agreement with him was still in effect and that it would be honored by the college. He could still sign an Adjunct Associate Professor contract for the 1988–89 academic year. Dr. Bina agreed to sign this contract and said that he was signing it without any conditions or reservations." Ex. 28.

In addition to the foregoing, I find that subsequent to the June 28 offer and its withdrawal, there was a one year adjunct position contract dated September 2, 1988 for the academic year 1988–1989 and a second one year adjunct position contract dated May 15, 1989 for the academic year 1989–1990 executed between the parties.

On these facts, the defendants argue the basic proposition that an offer may be withdrawn prior to its acceptance. *Merritt Land Corp. v. Marcello*, 110 R.I. 166, 171–172, 291 A.2d 263 (1972); and that it is inconsistent for the plaintiff to claim the benefits of the September 2, 1988 and May 25, 1989 con-

tracts for adjunct faculty membership and still assert entitlement to membership to the Ordinary Faculty as of those dates. He cannot have it both ways. In support, the defendants cite *Lawrence v. Providence College, et al.,* (D.R.I.C.A. No. 92–0443 L) wherein Chief Judge Lagueux of this court directed a judgment in favor of the defendants. The case is now on appeal before the First Circuit Court and its opinion, when published, will be controlling precedent here. However, for the reasons which follow, I do not have to wait for such precedent to be published.

The issue is whether the ten day time limitation for acceptance embodied in the June 27th offer was extended and, if so, was it validly withdrawn before Dr. Bina accepted?

■ I do not find that the offer was extended, but even if it was, Providence College's withdrawal after the July 26 meeting was perfectly legal and justified; at that meeting Dr. Bina made it pellucidly clear the offer was entirely unacceptable; his position was tantamount to an outright rejection. There was no obligation on the part of the defendants to continue, what at the time, were obviously futile negotiations. Dr. Bina's game was played too close to the vest; he outsmarted himself and has no one to blame but himself. He wanted to dictate the terms of the offer—a modification of the probationary period, which is not supported by any of the evidence.

■ Dr. Bina argues that his comments at the July 26 meeting did not amount to a rejection but rather a "grumbling acceptance." I have not uncovered any decision based upon Rhode Island law which discuss the concept of "grumbling acceptance." However, this theory is discussed in Professor Corbin's treatise. Normally, "[t]o be effective, an acceptance must be definite and unequivocal." *Ardente v. Horan,* 117 R.I. 254, 366 A.2d 162, 165 (1976). An acceptance which is "grumbling" may still be a valid acceptance.

An expression of acceptance is not prevented from being exact and unconditional by the fact that it is "grumbling" ... but it

must appear that the "grumble" does not go so far as to make it doubtful that the expression is really one of assent. . . .

Arthur L. Corbin, 1 *Corbin on Contracts* § 3.30 at 473–475 (1993). Professor Corbin offers the following example: "I accept your offer as made, but I still insist that you are driving a very hard bargain." *Id.* at 475. The treatise cites *Price v. Oklahoma College of Osteopathic Medicine and Surgery*, 733 P.2d 1357 (Okla.App.1986). In *Price*, a tenured professor signed his annual contract renewal with the following language: " 'signed under protest that salary does not reflect guarantees under present and past personnel policies and that proper evaluation procedures were not followed.' " *Id.* at 1358. The court found this to be an unequivocal acceptance.

Dr. Bina argues that *Price* is factually similar to the present case.

> There can be no serious doubt that [Dr. Bina] both by his actions and words conveyed to the defendant that he accepted the tenure track position. He was clearly unhappy about the rank he was being offered and the number of years of probation that he would have to serve until he were awarded tenure, but there can be no doubt that he was accepting the tenure track position.

Pl.'s Proposed Findings of Fact and Conclusions of Law at 38. I disagree with Dr. Bina. In *Price*, the plaintiff *signed* the contract and *added* the protest language. The signing of the contract was a clear acceptance of the contract. As I have stated above, Dr. Bina made clear at the July 26 meeting that the offer was unacceptable and his actions amounted to an outright rejection. A "grumbling acceptance" must be more "acceptance" than "grumble," which is not the case here.

 Dr. Bina also argues that the offer became irrevocable by his part performance of the contract. "[A]n irrevocable power of acceptance also is created by the offeree's part performance under an offer to a unilateral contract. . . ." Corbin, *supra* § 2.23 at 236. "[U]nilateral contracts are made by either an offer of a promise for a *performance* or by the offer of a *performance* for a promise." *Id.* § 1.23 at 91. To accept the

offer from Providence College, Dr. Bina had to respond in writing within ten days. It is difficult to imagine how one could "partly perform" a written response. Dr. Bina, however, argues that he accepted through part performance by working at Providence College throughout the summer. Further, he signed a one-year contract on September 2, 1988 for a term that ran from July 1, 1988 to June 1989. Plaintiff's argument is meritless. First, the one-year contract is an entirely separate offer from the offer for a tenure track position. Although the parties may have contemplated that Dr. Bina would be teaching at Providence College for the 1988–1989 year, this does not mean that they assumed he would be teaching in a tenure track position. Thus, Dr. Bina's work over the summer cannot be assumed to be an acceptance of a tenure track position. Second, Dr. Bina signed the one-year contract almost one month after he was informed that the offer had expired. Part performance makes an outstanding offer irrevocable, it does not revive an expired offer. Therefore, Dr. Bina's signing of the one-year contract did not create an irrevocable offer.

Finally, plaintiff argues that Father Cunningham made a second offer at the July 1 meeting. Plaintiff argues that the offer was the following. "If you do as I say, i.e. arrange the meeting with Dr. MacKay, the offer reflected in the June 27, 1988 contract, will remain open until the college informs you that there will be no further negotiating and you have to either take the offer . . . or leave the college." Pl.'s Proposed Findings of Fact and Conclusions of Law at 42. Since Dr. Bina did arrange a meeting with Dr. MacKay, he argues that the offer remained open. Plaintiff's version of the meeting with Father Cunningham is simply unsupported by the facts. As I have previously stated, Father Cunningham told Dr. Bina that the time period could be extended by "a few days" and urged him to see Dr. MacKay. I cannot agree that such language equates to an offer to keep the June 27 offer open indefinitely.

In summary, Dr. Bina did not accept the offer of June 27, 1988 for a tenure track position before the offer either expired or

was revoked by Providence College. His breach of contract claim must fail.

SO ORDERED.